**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2677-24

IN THE MATTER OF THE
APPLICATION OF THE
TOWNSHIP OF COLTS NECK,
A MUNICIPAL CORPORATION
OF THE STATE OF
NEW JERSEY.

_____

Argued May 20, 2026 – Decided July 24, 2026

Before Judges Currier, Berdote Byrne and Jablonski.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-2234-15.

Thomas J. Trautner, Jr. argued the cause for appellant Township of Colts Neck (Chiesa Shahinian & Giantomasi PC, attorneys; Thomas J. Trautner, Jr., Ronald L. Israel, and Alyssa E. Spector, on the briefs).

Ariela Rutbeck-Goldman argued the cause for respondent Fair Share Housing Center (Ariela Rutbeck-Goldman and Joshua D. Bauers, on the brief).

Craig M. Gianetti argued the cause for respondent Seta Realty Corp. (Day Pitney LLP, attorneys; Craig M. Gianetti, of counsel and on the brief; Chelsea Turiano, on the brief).

PER CURIAM

After the Township of Colts Neck ("Colts Neck") filed a declaratory judgment action seeking confirmation it had satisfied its Mount Laurel[1] affordable housing commitments, it entered into a Settlement Agreement ("Agreement") with the Fair Share Housing Center ("FSHC") that, among other obligations, required Colts Neck to provide sewer service for its planned development. When Colts Neck informed the court it could not fulfill this promise, FSHC moved to enforce the Agreement. The trial court held the Agreement was valid and ordered Colts Neck's compliance with certain modifications to it. After considering the record, the arguments presented by the parties on appeal, and the relevant legal principles, we affirm.

I.

Despite its extensive factual and procedural history, the issue before us is nuanced – the enforceability of the Agreement negotiated between Colts Neck and FSHC. Accordingly, we recount only the facts relevant to that issue for context.

The Agreement included plans for development at several sites in Colts Neck and, specifically, as to a portion of the municipality known as "Area 1."

---

[1] In re N.J.A.C. 5:96 and 5:97, 221 N.J. 1, 30 (2015) ("Mount Laurel IV").

A-2677-24

The Agreement included a durational adjustment[2] with a related waiver where Colts Neck would be excused from any project that would provide sewer service to its property under its Housing Element and Fair Share plan ("HEFSP"). Colts Neck also agreed to contribute up to $2 million toward extending sewer to Area 1, primarily through Manasquan River Regional Sewerage Authority ("MRRSA"), and to support applications for infrastructure expansion. Colts Neck was required to pay these funds to Toll Brothers, Inc. ("Toll Brothers") to develop the Area 1 sewer system. Toll Brothers was designated as the initial developer for the portion of Area 1 owned by Seta Realty Corp., an intervenor in this litigation. If Toll Brothers ever chose not to proceed with its development plans, Colts Neck instead would be required to pay those funds "to a developer of comparable reputation" to develop the sewer system.

Although the Agreement identified MRRSA as the primary proposed sewer solution for the inclusionary sites, it also recognized alternatives to MRRSA might be necessary – especially as to Area 1. Specifically, the parties

---

[2] A "durational adjustment" allows a municipality "to postpone satisfaction of its affordable housing obligation until water and sewer service actually become available." In re Petition for Substantive Certification, Twp. of Southampton, 338 N.J. Super. 103, 106 (App. Div. 2001).

agreed "a closer available tie-in along Route 34 or another location acceptable to both the developer and [Colts Neck]" may be required instead of connecting to MRRSA.

The Agreement contained a severability clause providing that if any provision were found to be invalid, illegal, or unenforceable, such a determination would not affect the validity nor enforceability of the remaining provisions.

In June 2020, the trial court conducted a fairness and preliminary compliance hearing. MRRSA and its member municipalities appeared as objectors, arguing Colts Neck was not entitled to a durational adjustment waiver under N.J.A.C. 5:93-4.3(c)(4) and that new developments in Colts Neck should not be allowed to connect to MRRSA's system or to obtain water service through neighboring Freehold Township. On August 13, 2020, the court determined the Agreement was fair and concluded Colts Neck had partially complied with its obligations.

Over the intervening years, problems and concerns arose over Colts Neck's ability to secure and to implement the required sewer services. After Colts Neck determined MRRSA was not an option for the Area 1 development,

it explored alternative service providers, including the Naval Weapons Station Earle ("NWSE") and the Two Rivers Water Reclamation Authority.

In May 2022, Colts Neck acknowledged it had overestimated the available treatment capacity at NWSE. It informed the court that, due to recent discussions about rising costs for providing sewer capacity, it no longer believed it was appropriate to pursue settlement negotiations or a full hearing regarding the proposal to supply sewer capacity to Area 1 from NWSE. It argued since it could not meet its obligations under the Agreement, the Agreement was void. On June 15, 2022, Colts Neck proposed an alternate HEFSP, other than the one previously approved by the court, that did not include the $2 million contribution.

In October 2022, FSHC moved to enforce litigant's rights, seeking enforcement of the court's August 13, 2020, judgment and the March 2020 Agreement under Rule 1:10-3. In November 2024, after hearing testimony from planners, engineers, and special adjudicators, the trial court issued a cogent and reasoned sixty-eight-page written decision granting (1) FSHC's motion to enforce its litigant's rights, and (2) Colts Neck's request for a conditional judgment of compliance subject to it satisfying certain conditions and amending its proposed HEFSP.

5

The court found the Agreement valid and enforceable. The court also concluded although the proposed HEFSP submitted by Colts Neck complied with its Mount Laurel Third Round obligations, it would be subject to certain amendments. Specifically, Colts Neck was required to revise its HEFSP to ensure the adoption and maintenance of certain zoning in Area 1 as required by the Agreement, and to reaffirm its obligation to provide the $2 million financial contribution to a sewer system in that parcel.

Although the court granted Colts Neck's request for a durational adjustment, it vacated the waiver that it previously approved in the Agreement. Consequently, Colts Neck was required to endorse all applications to the New Jersey Department of Environmental Protection ("NJDEP") to provide sewer service. The trial court ordered Colts Neck to adopt its HEFSP ordinance to permit development where the NJDEP approved infrastructure in Colts Neck for affordable housing. Colts Neck was also directed to work with a qualified developer to facilitate sewer service to Area 1 and to reserve new sewer capacity for affordable housing on a priority basis. Ultimately, the trial court entered a judgment of fairness and conditional compliance to Colts Neck.

The trial court also granted FSHC's application to enforce its litigant's rights. The trial court ordered Colts Neck to revise its draft HEFSP to comply

A-2677-24

with the Agreement, and the August 13, 2020, order within ninety days. Colts Neck remained obligated to commit at least $2 million toward extending water and sewer service to affordable housing in Area 1 and was required to maintain the overlay zoning adopted in December 2020. Additionally, the court ordered Colts Neck to revise its draft HEFSP to clarify Colts Neck would support and endorse all applications that developers deemed necessary to secure water and sewer service for affordable housing sites. Colts Neck was also required to prioritize Affordable Housing Trust Funds for water and sewer infrastructure, but they would not be used for NWSE during the Third Round. Finally, the court ordered Colts Neck to remove its market-to-affordable arrangement from its spending plan.

On appeal, Colts Neck argues the trial court improperly revised the Agreement by incorporating terms not bargained for by the parties, and it should have declared the entire Agreement null and void. We disagree.

II.

Our review of the results of a Mount Laurel fairness hearing is de novo. In re Application of Twp. of Bordentown, 471 N.J. Super. 196, 217 (App. Div. 2022) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). We will "'not disturb the factual findings and legal

conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974) (quoting Fagliarone v. Twp. of N. Bergen, 78 N.J. Super. 154, 155 (App. Div. 1963)).

"Trial courts have broad discretion when reviewing a municipality's Mount Laurel fair share plan for constitutional compliance." Bordentown, 471 N.J. Super. at 217-18 (citing Mount Laurel IV, 221 N.J. at 30). Consequently, trial courts are able to assess the "prompt voluntary compliance" of a municipality's affordable housing obligations and avoid "lengthy delay in achieving satisfaction of towns' Third Round obligations." Mount Laurel IV, 221 N.J. at 33.

Colts Neck has argued the Agreement be declared null and void. There is a strong public policy favoring settlement of litigation. Capparelli v. Lopatin, 459 N.J. Super. 584, 603 (App. Div. 2019). We "strain to give effect to the terms of a settlement wherever possible." Brundage v. Estate of Carambio, 195 N.J. 575, 601 (2008) (quoting Dep't of Pub. Advocate, Div. of Rate Counsel v. N.J. Bd. of Pub. Utils., 206 N.J. Super. 523, 528 (App. Div. 1985)). Because the "[i]nterpretation of a settlement agreement implicates

significant legal and policy principles, . . . the standard for vacating a settlement is not easily met." Kaur v. Assured Lending Corp., 405 N.J. Super. 468, 474 (App. Div. 2009) (citing Nolan v. Lee Ho, 120 N.J. 465, 472 (1990)). Thus, "[b]efore vacating a settlement agreement, our courts require 'clear and convincing proof' that the agreement should be vacated." Nolan, 120 N.J. at 472 (quoting DeCaro v. DeCaro, 13 N.J. 36, 42 (1953)).

"[A]bsent a demonstration of 'fraud or other compelling circumstances,'" a court should enforce a settlement agreement as it would any other contract. Jennings v. Reed, 381 N.J. Super. 217, 227 (App. Div. 2005) (quoting Pascarella v. Bruck, 190 N.J. Super. 118, 124-25 (App. Div. 1983)). Among the contract principles applicable to settlement agreements "are that courts should discern and implement the intentions of the parties[,]" and not "rewrite or revise an agreement when the intent of the parties is clear." See Quinn v. Quinn, 225 N.J. 34, 45 (2016). "Thus, when the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result." Ibid.

"[W]ords and phrases are not to be isolated but related to the context and the contractual scheme as a whole, and given the meaning that comports with the probable intent and purpose[.]" Wheatly v. Sook Suh, 217 N.J. Super.

233, 241 (App. Div. 1987) (quoting Newark Publishers' Ass'n v. Newark Typographical Union, 22 N.J. 419, 426 (1956)). To that end, courts must "give a faithful and logical reading to the words chosen by the parties to the agreement." GMAC Mortgage, LLC v. Willoughby, 230 N.J. 172, 183 (2017).

### A.

Because it was unable to procure sewer service for Area I, Colts Neck argues the Agreement was null and void. It further asserts the trial court improperly redrafted the Agreement when it severed the durational adjustment waiver provision but retained its financial obligations. We disagree as to both contentions.

### i.

Colts Neck's argument the Agreement is null and void because it depended on Area 1's sanitary service being provided through MRRSA is misplaced. The plain language of the Agreement states otherwise. Although the MRRSA is frequently referenced as the source of potential sewer connection for Area 1, the Agreement acknowledges that it is not the only option. Of particular importance is the language of Exhibit B to the Agreement that contained the agreed-upon terms on the provision of sewer to Area 1. Developers will:

A-2677-24

provide sanitary sewer service to the inclusionary development by extending sanitary sewer service from the Howell Wastewater Management Area and Wall Township Sanitary Sewer as identified [in] Exhibit A to this Agreement (or extend sanitary sewer service from a closer available tie-in along Route 34 or another location acceptable to both the developer and . . . [Colts Neck] to existing sewer collection service, if available) to the inclusionary project site . . . .

The document does not mention MRRSA nor is MRRSA a signatory, therefore, we conclude this language makes clear that the parties did not intend to make MRRSA the exclusive provider of sewer service. Instead, the Agreement provides flexibility for the sewer connection to be made from "a closer available tie-in along Route 34 or another location acceptable to both the developer and [Colts Neck]," thereby expressly allowing for alternatives to MRRSA.

Similarly, under paragraph 8(c)(iv):

[Colts Neck] agrees . . . to support and endorse, and if necessary become a co-applicant on[] any and all applications made to Monmouth County, DEP, the [MRRSA], any of MRRSA's constituent members, the Ocean County Utilities Authority ("OCUA"), Ocean County[,] and/or any other body politic or utility authority necessary in order to provide public sewer and water service to the parcels that are the subject of a durational adjustment . . . .

[Emphasis added.]

11

The language of this provision is similarly clear as to the parties' intent that MRRSA was not meant to be the only utility authority that could provide the sewer connection to the development sites. As the trial court stated, "[n]o reason exists . . . for limiting the provider of wastewater transmission and treatment to MRRSA and OCUA. As reflected in the submissions and testimony presented by the parties – including Colts Neck – to the court, MRRSA is not the only potential provider of sewer service for Area 1." Further, nowhere in the Agreement is there a requirement that the grant of the durational adjustment waiver is contingent solely on MRRSA's participation. Accordingly, Colts Neck's argument that the entire Agreement is void, because MRRSA cannot provide the service, is contrary to the language and intent of the parties. The trial court properly exercised its discretion in arriving at this conclusion.

ii.

Colts Neck's argument that its financial obligation to contribute up to $2 million for sewer infrastructure in Area 1 was inextricably tied to its entitlement to the durational adjustment waiver is not supported by the language of the Agreement.

12

The durational adjustment waiver provision does not reference, explicitly or implicitly, that Colts Neck's waiver was conditioned upon its commitment to contribute monies to the sewer service development:

> The combination of the developments planned to meet [Colts Neck]'s obligation, in accordance with the terms of this Agreement, are sufficient to meet and exceed [Colts Neck]'s 306-unit Third Round Prospective Need. Therefore, the requirements included in N.J.A.C. 5:93-4.3(c)3 and 4 related to inclusion in a fair share plan when the DEP or its designated agent approves a proposal to provide water and/or sewer to a site other than those designated for the development of low and moderate income housing in the housing element are hereby waived in accordance with N.J.A.C. 5:93-4.3(c)4, which permits waiver of such requirements when a municipality has a plan that will provide water and/or sewer to sufficient sites to address the municipal housing obligation within the period of repose.

By the plain language of this provision in the Agreement, it is clear Colts Neck was granted a waiver because the combination of the developments in Colts Neck's HEFSP was "sufficient to meet and exceed" its third-round obligations. The waiver is a regulatory benefit that relieved Colts Neck from having to endorse or to amend its plans for other sites. It is neither a condition precedent nor consideration for Colts Neck's financial contribution; rather, it is a benefit of having a compliant plan in place.

13

Additionally, Exhibit B neither states Colts Neck's financial contribution under the Affordable Housing Grant is conditioned on the continued availability of the waiver, nor does it provide the obligation to fund sewer infrastructure is extinguished if the waiver is lost. In fact, the language plainly states Colts Neck's "obligation to make the Affordable Housing Grant available to a comparable developer" is conditioned upon:

> (1) [Colts Neck] approving, in its reasonable discretion, the developer as having a comparable reputation to Toll Brothers based upon, at minimum, having built in excess of 500 residential dwelling units through inclusionary development and having built not less than five inclusionary development projects of at least 100 single-family[] apartment or townhome units; and
>
> (2) [Colts Neck] and the developer entering into an Affordable Housing Grant Agreement; and
>
> (3) the developer guaranteeing completion of the inclusionary development project (including the extension of sanitary sewer service) by: (i) performance bonds to be obtained by the developer; as well as (ii) a performance guarantee agreement between the developer and [Colts Neck].

Notably, there is no mention of the waiver as a condition precedent or subsequent to Colts Neck's funding obligation. The Agreement neither ties Colts Neck's financial obligation to the existence nor continuation of the waiver. Therefore, it is clear the parties intended the obligation to fund sewer

14

infrastructure independent of whether Colts Neck has a durational adjustment waiver or not. Thus, the loss of the waiver neither voids the Agreement nor does it relieve Colts Neck of its obligation to contribute to the sewer infrastructure.

iii.

The durational adjustment waiver provision was severable from the Agreement. Severability clauses "are indicative of the parties' intent that the agreement as a whole survives the excision of an unenforceable provision." Arafa v. Health Express Corp., 243 N.J. 147, 169 n.2 (2020). The Agreement contains the following severability paragraph:

> Unless otherwise specified, it is intended that the provisions of this Agreement are to be severable. The validity of any article, section, clause or provision[] of this Agreement shall not affect the validity of the remaining articles, sections, clauses or provisions hereof. If any section of this Agreement shall be adjudged by a court to be invalid, illegal, or unenforceable in any respect, such determination shall not affect the remaining sections.

The language of this paragraph reflects the parties' intent the Agreement's provisions are severable unless expressly stated otherwise. The durational adjustment waiver clause included in the Agreement does not contain any specific indication that it is non-severable or "essential," whereas

15

other paragraphs of the Agreement do use this term. Additionally, the Agreement specifically provides that if any clause is severed or found unenforceable, this "shall not affect the validity" of the remaining provisions. The use of this mandatory language was intentional. Therefore, the trial court correctly concluded "the court can [sever the durational adjustment waiver provision] under paragraph 30" without invalidating the rest of the Agreement.

Severability is appropriate where, as here, removing the unenforceable provision leaves the remainder of the Agreement consistent with the parties' central purpose. "Severability is only an option if striking the unenforceable portions of an agreement leaves behind a clear residue that is manifestly consistent with the 'central purpose' of the contracting parties, and that is capable of enforcement." NAACP of Camden Cty. E. v. Foulke Mgmt. Corp., 421 N.J. Super. 404, 437 (App. Div. 2011).

The central purpose of the Agreement was to resolve Colts Neck's third-round affordable housing obligations by establishing the number of housing units, identifying sites for inclusionary development, and outlining Colts Neck's obligations to facilitate affordable housing. Severing the waiver provision does not frustrate this purpose. Instead, it means Colts Neck must comply with the regulatory requirements for a durational adjustment and will

16

not be able to control the location of the site to be developed, but the remainder of the Agreement remains fully enforceable.

In sum, Colts Neck has not provided any "clear and convincing proof" that the entire Agreement should be voided. Nolan, 120 N.J. at 472. The trial court's decision to sever the waiver provision and enforce the remainder of the Agreement is not only consistent with the parties' expressed intent and the plain language of the Agreement, but also with New Jersey's strong public policy favoring the enforcement of settlements. As such, we agree with the trial court the waiver provision may be severed without voiding the entire Agreement.

## B.

Colts Neck argues the trial court impermissibly expanded the requirements of N.J.A.C. 5:93-4.3(c) by compelling it to commit $2 million toward sewer and water infrastructure in Area 1 and to prioritize affordable housing trust funds for such purposes. We disagree.

### i.

Colts Neck contends the trial court lacked authority under the Fair Housing Act to require it to expend its own resources to connect sewer and water to Area 1. Citing N.J.S.A. 52:27D-311(d), Colts Neck argues that it

A-2677-24

"cannot be compelled to expend its own money to facilitate the acquisition or construction of water or sewer infrastructure." However, we conclude this position is flawed for two reasons: (1) Colts Neck agreed to financially contribute to the development of sewer in Area 1 as part of the Agreement; and (2) Colts Neck has a fiscal obligation to facilitate provision of water and sewer to affordable housing sites.

The terms of the Agreement required Colts Neck to contribute up to $2 million toward the development of sewer infrastructure for Area 1. This financial commitment was not imposed unilaterally by the court, but instead was a bargained-for term of the Agreement, from which Colts Neck received substantial benefits. Additionally, even beyond the terms of the Agreement, Colts Neck has an affirmative obligation to aid with development of sites for affordable housing. Under the Mount Laurel progeny, a municipality has a constitutional obligation to provide a "realistic opportunity" for the development of its fair share of affordable housing. S. Burlington County NAACP v. Mt. Laurel, 92 N.J. 158, 221 (1980). The importance of available public water and sewer to the potential development of real property for affordable housing has been recognized by our courts. As noted by the court in In re Petition for Substantive Certification, Tp. of Southampton, County of

18

Burlington, 338 N.J. Super. 103, 116 (App. Div. 2001), "the lack of public water or sewer service would preclude high density residential development on [a] site." Fundamentally, "sewer and other infrastructure must be available to establish a realistic opportunity for the construction of affordable housing." Id. at 117. As such, "[w]here sewer infrastructure is not in place, it is crucial that it can be brought to a site at a reasonable cost. . . . . To that end, municipalities have an affirmative obligation to facilitate provision of the infrastructure necessary to make development" of affordable housing site possible. In re Adoption of Amendments to N.J.A.C., 339 N.J. Super. 371, 386 (App. Div. 2001).

While N.J.S.A. 52:27D-311(d) provides "[n]othing in [N.J.S.A. 52:27D-301 to -329] shall require a municipality to raise or expend municipal revenues in order to provide low- and moderate-income housing," interpreting this to mean that municipalities do not have to contribute to any affordable housing-related costs would be contrary to established rules and precedent.

Accordingly, the trial court did not impose an additional requirement that Colts Neck financially contribute to sewer extension into Area 1 because it was an agreed-upon term of the Agreement in light of its constitutional obligation to aid with development of sites for affordable housing.

Finally, Colts Neck contends the trial court exceeded its authority by dictating how the Affordable Housing Trust Fund should be spent, which is a matter of municipal discretion under Council on Affordable Housing ("COAH") rules. Its argument stems from trial court's requirement to amend Colts Neck's newly proposed HEFSP.

To demonstrate a municipality has complied with Mount Laurel, the housing plan must show how it has "in fact" created a "realistic opportunity for the construction of its fair share of low- and moderate-income housing." S. Burlington County NAACP, 92 N.J. at 221-22. The analysis whether the opportunity is "realistic" depends on "whether there is . . . a likelihood . . . that the lower income housing will actually be constructed." Id. at 222. In 2015, the Court declared that "Mount Laurel judges may exercise the same level of discretion [as COAH] when evaluating a municipality's plan for Mount Laurel compliance." Mount Laurel IV, 221 N.J. at 32. The Court "gave the trial courts considerable flexibility in assessing need, allocating it by region and municipality, and in evaluating municipal plans for compliance." In re Decl. Judgment Actions Filed by Various Muns., 227 N.J. 508, 525 (2017) (citing Mount Laurel IV, 221 N.J. at 29-33). The Court specifically "did not limit the

work of the trial courts except to attempt to cabin the time within which progress would be made toward recapturing the lost opportunity to advance municipal compliance with affordable housing obligations." Ibid. (citing Mount Laurel IV, 221 N.J. at 33).

In June 2022, Colts Neck unilaterally proposed an amended HEFSP, which no longer provided for development of Area 1, and instead sought to redirect the funding to a market to affordable program, which would bring only three affordable housing units instead of 142 as originally planned. As the trial court indicated,

> [i]f Colts Neck is permitted to rely upon a market to affordable program as a part of the HEFSP, it will use approximately $700,000 of its affordable housing trust fund for the development of three units of affordable housing, and will not be applying those funds for development of a sewer system for Area 1, which Colts Neck recognized in the March 18, 2020[,] . . . [A]greement as a crucial component of its [t]hird [r]ound plan to bring affordable housing to Colts Neck and which is expected to produce 142 affordable units.

The trial court further explained that "these funds could facilitate sewers and enable the construction of a substantial number of affordable units through development of a sewer system in Area 1." Given the already significant gap between Colts Neck's expected third round compliance, the reality of unfulfilled constitutional obligations, and a proposed HEFSP that would set

21

Colts Neck even further back, the trial court properly decided that the trust fund monies should be prioritized for "realistic opportunities" that would address a larger portion of Colts Neck's affordable housing obligation.

Accordingly, the trial court did not exceed its authority in requiring that spending out of the Affordable Housing Trust Fund be prioritized for sewer infrastructure in Area 1.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

A-2677-24